443 S.E.2d 196

**Glenn M. WILT and Sandra B. Wilt, Plaintiffs Below, Appellees,**

v.

**Robert BURACKER, Sheriff as Successor in Interest to Roy E. Thompson, Administrator to the Estate of Charles W. Nickelson, Jr., Defendant Below, Appellant.**

No. 21708.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 28, 1993.

Decided Dec. 13, 1993.

Concurring Opinion of Justice Neely April 20, 1994.

Certiorari Denied May 31, 1994.

See 114 S.Ct. 2137.

---

John C. Skinner, Jr., F. Samuel Byrer, Deborah L. Barr, Nichols & Skinner, Charles Town, for appellees.

Walter M. Jones III, E. Kay Fuller, Martin & Seibert, Martinsburg, for appellant.

MILLER, Justice:

This appeal is from a jury verdict and final order of the Circuit Court of Jefferson County entered November 18, 1992, in favor of the appellees and plaintiffs below, Glenn M. Wilt and Sandra B. Wilt. The plaintiffs sustained permanent injuries when the automobile in which they were riding was struck by a vehicle driven by Charles W. Nickelson, Jr. Mr. Nickelson was killed in the collision, and this action was brought against his estate.

At trial, the plaintiffs presented the testimony of several police officers who testified that Mr. Nickelson had an empty bottle of "Wild Turkey" whiskey between his legs when they removed his body from the accident scene. The officers also testified that there were several other empty alcoholic beverage containers found in the vehicle and that the smell of alcohol coming from the vehicle was "extreme." Moreover, the deposition testimony of Lori Hall, a passenger in Mr. Nickelson's car, was read to the jury. It was to the effect that she and Mr. Nickelson had been drinking "Wild Turkey" whiskey earlier in the day, although she could not remember the quantity they had consumed.

The plaintiffs also presented the testimony of John Kaputska, who observed the Nickelson vehicle for several minutes immediately

prior to the accident.[1] Mr. Kaputska testified that the Nickelson vehicle caught his attention because it was being driven erratically, was following his vehicle too closely, and was not being driven in a straight line. The Nickelson vehicle then passed Mr. Kaputska at a high rate of speed, and Mr. Kaputska lost sight of the Nickelson vehicle as it went around a curve in the road. As Mr. Kaputska came around the curve, he saw that the Nickelson vehicle had struck the Wilt vehicle.

## I.

The primary reason we accepted this appeal was to determine whether the testimony of an economist calculating a monetary amount of damages for the loss of enjoyment of life, often called hedonic damages, is admissible evidence. This Court held in *Flannery v. United States*, 171 W.Va. 27, 297 S.E.2d 433 (1982), that damages for the *loss of enjoyment of life* are a valid element of recovery when a plaintiff has suffered a permanent injury.[2] "[O]nce a permanent injury has been established ... the plaintiff is entitled to additional damages ... for the permanent effect of the injury itself on 'the capability of an individual to function as a whole man.'" 171 W.Va. at 30, 297 S.E.2d at 436, *quoting Jordan v. Bero*, 158 W.Va. 28, 51, 210 S.E.2d 618, 634 (1974). We went on to explain in *Flannery:*

"[T]he loss of enjoyment of life is encompassed within and is an element of the permanency of the plaintiff's injury. To state the matter in a slightly different

manner, the degree of permanent injury is measured by ascertaining how the injury has deprived the plaintiff of his customary activities as a whole person. The loss of customary activities constitutes the loss of enjoyment of life." 171 W.Va. at 30, 297 S.E.2d at 436.

### A.

Before we embark on a discussion of hedonic damages, it is necessary to establish the test for admissibility of expert testimony. Our cases contain some variation on this issue, particularly after our adoption of Rule 702 of the West Virginia Rules of Evidence.[3] We note that our Rule 702 is identical to Rule 702 of the Federal Rules of Evidence. Of some significance, then, is the United States Supreme Court's recent decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), that discussed the relationship of Rule 702 with the traditional federal evidentiary rule on expert testimony that was first articulated in *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923).[4]

Before we adopted Rule 702, we recognized the *Frye* test and set out our version of it in Syllabus Points 7 and 8 of *State v. Clawson*, 165 W.Va. 588, 270 S.E.2d 659 (1980):

"7. In order for a scientific test to be initially admissible, there must be general acceptance of the scientific principle which underlies the test.

---

1. Mr. Kaputska was driving his vehicle along the same road and in the same direction as the Nickelson vehicle.

2. A recent article by D.L. Price entitled *Hedonic Damages: To Value a Life Or Not to Value a Life*, 95 W.Va.L.Rev. 1055 (1993), discusses this question with some emphasis on *Flannery v. United States, supra.*

3. Rule 702 of the West Virginia Rules of Evidence states:

   "**Rule 702. Testimony by Experts.**
   If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or edu-

cation may testify thereto in the form of an opinion or otherwise."

4. *Frye* propounded a "general acceptance" test for scientific principles that was explained as follows:

   "Just when a scientific principle or discovery crosses the line between the experimental and the demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs." 54 App.D.C. at 47, 293 F. at 1014.

"8. There are certain scientific tests that have been widely used over a long period of time, such that their general acceptance in the scientific community can be judicially noticed."

See also State v. Armstrong, 179 W.Va. 435, 369 S.E.2d 870 (1988); State v. Barker, 179 W.Va. 194, 366 S.E.2d 642 (1988). As we stated in Syllabus Point 8 of Clawson, where the scientific test is generally accepted, it can be judicially noticed and the expert need not demonstrate its scientific validity.[5] We also stated in note 4 of State v. Armstrong, 179 W.Va. at 439–40, 369 S.E.2d at 874–75 (1988), that there is a general trend under Rule 702 to liberalize the Frye rule:

"An increasing number of the courts and many of the leading commentators interpret Rule 702 of the Federal Rules of Evidence, which is identical to our Rule 702, as limiting the Frye 'general acceptance' test to a test solely for determining whether judicial notice can be taken of the scientific test's general reliability. See P. Giannelli and E. Imwinkelreid, Scientific Evidence §§ 1–5, 1–5(E)–(F), 1–6, 1–6(A)–(D) (1986) (collecting authorities); Giannelli, General Acceptance of Scientific Tests— Frye and Beyond, in Scientific and Expert Evidence 11–32 (E. Imwinkelreid 2d ed. 1981). Therefore, according to this view, a scientific expert's testimony is admissible if shown to involve relevant scientific tests which assist the trier of fact to understand the evidence, even if such tests and the underlying scientific principle(s) are not yet generally accepted in the particular scientific field." (Emphasis in original).

**5.** We elaborated on this point in State v. Woodall, 182 W.Va. 15, 22, 385 S.E.2d 253, 260 (1989):
"The basic reliability of scientific tests is often at issue when such evidence is admitted. Judicial resources can be squandered attacking and supporting scientific tests that are, in fact, generally accepted by scientists in the field.... For reasons of judicial economy, at some point a trial court may take judicial notice of a test's general reliability. This point occurs when the issue of a test's reliability has been addressed authoritatively by senior appellate courts in a line of cases that determine that the test in question is generally accepted by scientists. This comports with the provisions of W.Va. R.Evid., Rule 201 [1985]."

In Daubert, supra, the United States Supreme Court reexamined the Frye standard and determined that it was too stringent as applied to the admissibility of expert testimony in light of Rule 702 of the Federal Rules of Evidence. The plaintiffs in Daubert sought to introduce expert testimony showing the relationship between a drug manufactured by the defendant and birth defects in children whose mothers had taken the drug while pregnant with those children. The defendant argued that the expert testimony offered by the plaintiffs could not meet Frye's "general acceptance" test. The trial court and the Ninth Circuit Court of Appeals agreed,[6] with the Court of Appeals stating that because the expert testimony proffered had not been published or subjected to peer review, it could not be shown to be a generally accepted scientific technique, and was thus violative of the Frye standard.

The United States Supreme Court reversed and held that the Frye test was superseded by Rule 702 because the Frye test was not included within Rule 702:

"Nothing in the text of [Rule 702] establishes 'general acceptance' as an absolute prerequisite to admissibility.... The drafting history makes no mention of Frye, and a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.' Beech Aircraft Corp. v. Rainey, 488 U.S. [153,] 169, [109 S.Ct. 439, 450, 102 L.Ed.2d 445, 463 (1988) ] (citing Rules 701 to 705)." 509 U.S. at —, 113 S.Ct. at 2794, 125 L.Ed.2d at 480. (Citation omitted.)[7]

**6.** See 951 F.2d 1128 (9th Cir.1991).

**7.** The Supreme Court went on to state:

"Given the Rules' permissive backdrop and their inclusion of a specific rule on expert testimony that does not mention 'general acceptance,' the assertion that the Rules somehow assimilated Frye is unconvincing. Frye made 'general acceptance' the exclusive test for admitting expert scientific testimony. That austere standard, absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials." 509 U.S. at —, 113 S.Ct. at 2794, 125 L.Ed.2d at 480. (Footnote omitted).

Nonetheless, the Supreme Court clearly concluded that the standard established in Rule 702 would not "result in a 'free-for-all' in which befuddled juries are confounded by absurd and irrational pseudoscientific assertions." 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.[8] The Supreme Court emphasized that in supplanting the *Frye* test by Rule 702, this did *not* abandon all limits on the admissibility of purportedly scientific evidence, but rather that, "under the Rules [of Evidence] the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 480.

The Supreme Court outlined the various types of considerations that a trial court must take into account when determining the admissibility of expert testimony under Rule 702,[9] and concluded that the inquiry must be a flexible one:[10] "[The] overarching subject [of Rule 702] is the scientific validity—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not the conclusions that they generate." 509 U.S. at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 484.

The Court also recognized:

"[I]n practice, a gatekeeping role for the judge, no matter how flexible, inevitably on occasion will prevent the jury from learning of authentic insights and innovations. That, nevertheless, is the balance that is struck by Rules of Evidence designed not for the exhaustive search for cosmic understanding but for particularized resolution of legal disputes." 509 U.S. at ——, 113 S.Ct. at 2798–99, 125 L.Ed.2d at 485. (Footnote omitted).

In summary, the Supreme Court concluded:

" '[G]eneral acceptance' is not a necessary precondition to the admissibility of scienti-

---

**8.** The Supreme Court stated that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. *See Rock v. Arkansas*, 483 U.S. 44, 61, [107 S.Ct. 2704, 2714, 97 L.Ed.2d 37, 52] (1987)." 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.

The Court also noted that a trial court may direct a verdict where it reaches the conclusion "that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true[.]" 509 U.S. at ——, 113 S.Ct. at 2798, 125 L.Ed.2d at 484.

**9.** Procedurally, as the Supreme Court observed in *Daubert:* "Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. (Footnotes omitted).

**10.** The considerations named by the Supreme Court include:

(1) A determination of whether the expert testimony is in fact "scientific knowledge." ("[I]n order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method. Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481.).

(2) A determination of whether the expert evidence or testimony will " 'assist the trier of fact to understand the evidence or to determine a fact in issue.' This condition goes primarily to relevance." 509 U.S. at ——, 113 S.Ct. at 2795, 125 L.Ed.2d at 481. ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility." 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482.).

(3) "[A] preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." 509 U.S. ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. (Relevant considerations thereto include (a) whether the theory or technique "can be (and has been) tested"; (b) "whether the theory or technique has been subjected to peer review and publication") ("The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised."); (c) what is the known or potential rate of error of particular scientific techniques; and (d) whether there is general acceptance of the theory ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique that has been able to attract only minimal support within the community,' [*United States v.*] *Downing,* [753 F.2d 1224, 1238 (3d Cir.1985),] may properly be viewed with skepticism."). 509 U.S. at ——, 113 S.Ct. at 2797, 125 L.Ed.2d at 483. (Citation omitted).

fic evidence under the Federal Rules of Evidence, but the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony both rests upon a reliable foundation and is relevant to the task at hand. Pertinent evidence based on scientifically valid principles will satisfy those demands." 509 U.S. at ——, 113 S.Ct. at 2799, 125 L.Ed.2d at 485.

■ We also note that the Court in *Daubert* found that certain scientific theories could be judicially noticed. The Court stated in note 11: "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended. Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Fed.Rule Evid. 201." 509 U.S. at ——, 113 S.Ct. at 2796, 125 L.Ed.2d at 482. *See also* note 5, *supra.* We also are of the view that, under Rule 702, there is a category of expert testimony based on scientific methodology that is so longstanding and generally recognized that it may be judicially noticed, and, therefore, a trial court need not ascertain the basis for its reliability.

■ Thus, we believe that *Daubert* is directed at situations where the scientific or technical basis for the expert testimony cannot be judicially noticed and a hearing must be held to determine its reliability. We conclude that *Daubert*'s analysis of Federal Rule 702 should be followed in analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence. The trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from scientific methodology. Moreover, the testimony must

be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.[11]

### B.

■ Our customary rule for determining whether a trial court's ruling on the admissibility of expert testimony is erroneous is contained in Syllabus Point 12 of *Board of Education v. Zando, Martin & Milstead,* 182 W.Va. 597, 390 S.E.2d 796 (1990):

"' "Whether a witness is qualified to state an opinion is a matter which rests within the discretion of the trial court and its ruling on that point will not ordinarily be disturbed unless it clearly appears that its discretion has been abused." Point 5, syllabus, *Overton v. Fields,* 145 W.Va. 797 [117 S.E.2d 598 (1960) ].' Syllabus Point 4, *Hall v. Nello Teer Co.,* 157 W.Va. 582, 203 S.E.2d 145 (1974)."

■ Applying Rule 702 to the case at bar, we must consider whether the specialized knowledge of the plaintiffs' expert was relevant [12] to the calculation of damages for the plaintiffs' loss of enjoyment of life such that it would "assist the trier of fact to understand the evidence or to determine a fact in issue." Because we are not convinced that the testimony offered by the plaintiffs' expert has any relevance whatsoever to a calculation

---

**11.** We recognize that Rule 702 is not confined to scientific expert testimony, but applies to "scientific, technical, or other specialized knowledge[.]" The Supreme Court in *Daubert, supra,* confined its discussion to scientific expert testimony. The two justices who joined in a separate opinion concurring, in part, and dissenting, in part, raised the question: "Does all of this dicta apply to an expert seeking to testify on the basis of 'technical or other specialized knowledge' ... or are the 'general observations' limited only to 'scientific knowledge'?" 509 U.S. at ——, 113

S.Ct. at 2800, 125 L.Ed.2d at 487. The foregoing textual standards may still be applied to any expert by deleting the word "scientific."

**12.** As we stated in *Gilman v. Choi,* 185 W.Va. 177, 179, 406 S.E.2d 200, 202 (1990): "Rule 702 of the *West Virginia Rules of Evidence* ... is concerned primarily with the *relevancy* of expert testimony. *See* syl. pts. 1–2, *State v. McCoy,* 179 W.Va. 223, 366 S.E.2d 731 (1988)." (Emphasis added).

of damages for the loss of enjoyment of life, we conclude that the trial court abused its discretion by allowing the testimony at trial.

The economic calculations for Mrs. Wilt's claim for hedonic damages were presented through the testimony of economist Michael Brookshire, Ph.D. Dr. Brookshire utilized a theory that *every* human life has the same whole-life value. This "benchmark" whole-life value was arrived at by combining and averaging the economic values arrived at in over 50 "willingness-to-pay" studies.[13] According to Dr. Brookshire, this whole-life value is the same for all persons and is set at $2.5 million. From this amount, he subtracts another average value that he terms the "economic machine." The economic machine represents the value of a person's average lifetime economic earnings, such as wages, fringe benefits, and household services. This value is estimated at $800,000, leaving as a "bench-mark" value $1.7 million, which is contended to be the general value of the loss of enjoyment of life to the average unknown American.

The plaintiffs also presented the testimony of a psychologist who estimated that Mrs. Wilt, based upon loss-of-enjoyment-of-life tests he had devised, had suffered a 51–60 percent loss of her enjoyment of life. Using the percentage assigned by the psychologist, Dr. Brookshire then calculated Mrs. Wilt's net economic loss of enjoyment of life by applying it to the bench-mark figure of $1.7 million and factoring in Mrs. Wilt's life expectancy. Mrs. Wilt's net economic loss of enjoyment of life was fixed at $685,493.

Our initial concern is that the willingness-to-pay studies upon which Dr. Brookshire's calculations are based have no relevance to the particular loss of enjoyment of life suffered by a plaintiff due to a given permanent injury. The willingness-to-pay studies that were used did not involve persons suffering a permanent injury in a personal injury context. Moreover, the willingness-to-pay studies did not use methodology designed to calculate the loss of enjoyment of life, but were nonetheless extrapolated by Dr. Brookshire into what he claimed to be valid data for calculating damages for Mrs. Wilt's loss of enjoyment of life.

The underlying studies were not presented into evidence and are not a part of the record. Consequently, it is not possible to determine their precise methodology. Certainly, under any Rule 702 analysis, without a detailed explanation of the underlying studies' methodology, the expert testimony would not meet the reliability standard and the testimony should be excluded.

Even if we were to assume that Dr. Brookshire's explanation of the reliability of the willingness-to-pay studies was sufficient, the question would then be whether the studies were sufficiently relevant to support his calculations on loss of enjoyment of life. In his testimony, Dr. Brookshire gave an example of the loss-of-enjoyment-of-life methodology. This example was based on wage-versus-risk studies and involved a hypothetical illustration of 10,000 window washers working on skyscrapers and the risk of death between those working on the first-floor windows and those working on the top floors. From federal statistics, he found a 1 in 10,000 greater chance of death for top-floor window washers than other window washers. He then assumed a wage differential of $300 per year for top-floor washers. Thus, the bottom-floor washers were willing to accept $300 less a year to avoid the top-floor work. He concluded that if the 10,000 workers were willing to accept $300 less, then the value of one life in that context is $3,000,000.[14]

13. According to Dr. Brookshire, the bench-mark value of an abstract average American's whole life can be derived from willingness-to-pay studies. The willingness-to-pay studies are based upon several categories of statistical data obtained from the following sources: (1) wage risk studies of the United States Government that depict the wage differential in high risk jobs; (2) behavioral studies focusing on a consumer's willingness to pay for safety devices; (3) economic cost estimates used by federal agencies issuing safety regulations; and (4) a combination of the foregoing.

14. The testimony in this regard was as follows:

"Q. Could you discuss in more detail how the studies of differing wage rates [versus] different risks of death generate values of life from the actual decisions of workers?

"A. Yes, there are four foundations for that two and-a-half million dollar conclusion. The

Although the foregoing illustration was not taken from any of the willingness-to-pay studies, Dr. Brookshire testified that it was designed to illustrate the methodology used in a wage-versus-risk study approach to determine the total value of a life. Even if we were to assume that this methodology has some valid economic basis, we reject it from a legal standpoint because it has nothing to do with defining the particular value of the loss of *enjoyment of life* in this case.[15]

Moreover, the calculations are based on assumptions that appear to controvert logic and good sense. Anyone who is familiar with the wages of coal miners, policemen, and firefighters would scoff at the assertion that these high risk jobs have any meaningful extra wage component for the risks undertaken by workers in those professions.[16]

The majority of jurisdictions that have addressed whether expert testimony based upon willingness-to-pay studies is relevant to one's loss of enjoyment of life have concluded that such testimony is inadmissible. The most thorough analysis of this issue was made by the Court of Appeals for the Seventh Circuit in *Mercado v. Ahmed,* 974 F.2d 863, 871 (7th Cir.1992):

"[W]e have serious doubts about [the] assertion that the studies [relied] upon actually measure how much Americans value life. For example, spending on items like air bags and smoke detectors is probably influenced as much by advertising and marketing decisions made by profit-seeking manufacturers and by government-mandated safety requirements as it is by any consideration by consumers of how much life is worth. Also, many people may be interested in a whole range of safety devices and believe they are worthwhile, but are unable to afford them. More fundamentally, spending on safety items reflects a consumer's willingness to pay to reduce *risk*, perhaps more a measure of how cautious a person is than how much he or she values life. Few of us, when confronted with the threat, 'Your money or your life!' would, like Jack Benny, pause and respond, 'I'm thinking, I'm thinking.' Most of us would empty our wallets. Why that decision reflects less the value we place on life than whether we

---

first is something called: Wage [versus] risks studies.

"Let me try to give you an example of how these studies work. Let's talk about first floor window washers on skyscrapers [versus] top floor window washers on sky [scrapers]. They do exactly the same job. But let's assume that out of every 1000 such window washers those who work on the top floor have a 1 in 10,000 greater chance of death on the job. We know that from federal statistics by occupation on what the death risk is.

\* \* \*

"So, if there is 1 in 10,000 difference in death what if the economists ... and this is what happens in these studies that I am going to talk about, look at the average wage differentials, this comes from Adam Smith, what if we knew that there was an average wage difference of $300.00 a year for 10,000 first floor window washers.

"That is, they are willing to pay these first floor window washers $300.00 a year in terms of lower wages: 'we will accept $300.00 a year just don't make us go on that top floor.'

"That means that 10,000 workers were willing to pay $300.00 each, that is three million dollars, to save one human life. Remember if they go up to the top floor one of those 10,000 will die."

**15.** The willingness-to-pay studies do not relate in any way to the actual component of damages, the *enjoyment* of life.

**16.** Another illustration was given to disclose the methodology underlying the value of the average life by using studies on consumers' willingness to pay for safety devices to protect their lives. Dr. Brookshire set the cost of an automobile airbag at $300 and indicated that with an airbag the risk of death went down by 1 in 10,000, that is, one life will be saved if 10,000 people have air bags. He then concluded:

"Let's say we do a study on air bags, and this is one that economists have done, we knew [*sic*] that out of 10,000 people that buy air bags they pay an average of ... let's give you the same number, $300.00 a year for an air bag. I think it is more expensive than that, but let's just use the same example; $300.00 each for an air bag.

"Let's say that we knew the highway death statistics, and by the mid 1980s we did know these things, we didn't have these statistics until the mid 1980s, that with an air bag the risk of death goes down about 1 in 10,000. Out of 10,000 people one life will be saved if 10,000 folks have an air bag.

"What does that mean? 10,000 people spend $300.00 each, that is three million in total, to save one life."

buy an airbag is not immediately obvious." (Emphasis in original).

The *Mercado* court also addressed the relevancy of other studies that have been used to support calculations for hedonic damages. Those studies were similar to the ones used by Dr. Brookshire and included the amount of extra salary paid to those who perform risky work. Another study focused on government estimates concerning increased costs for complying with health and safety regulations:

"*To say that the salary paid to those who hold risky jobs tells us something significant about how much we value life ignores the fact that humans are moved by more than monetary incentives.* For example, someone who believes police officers working in an extremely dangerous city are grossly undercompensated for the risks they assume might nevertheless take up the badge out of a sense of civic duty to their hometown. Finally, government calculations about how much to spend (or force others to spend) on health and safety regulations are motivated by a host of considerations other than the value of life: is it an election year? how large is the budget deficit? on which constituents will the burden of the regulations fall? what influence and pressure have lobbyists brought to bear? what is the view of interested constituents? And so on." 974 F.2d at 871. (Emphasis added).[17]

In *Foster v. Trafalger House Oil & Gas,* 603 So.2d 284 (La.App.1992), the court recognized, as we did in *Flannery,* that the loss of enjoyment of life is an element of general damages. That court went on to elaborate on the nature of the task of determining the amount of such damages:

"[C]ompensation [for general damages] is never a true measure or a true compensation for what is lost. The task of awarding general damages is a uniquely human endeavor, not only calling upon the trier of fact to consider the host of factors unique

to each individual case, but also requiring the trier of fact to draw upon the virtually unlimited factors unique to us as human beings....

"[E]conomic theories which attempt to extrapolate the 'value' of human life from various studies of wages, costs, etc., have no place in the calculation of general damages." 603 So.2d at 286.

*See also Livingston v. United States,* 817 F.Supp. 601 (E.D.N.C.1993) (applying North Carolina law); *Sterner v. Wesley College, Inc.,* 747 F.Supp. 263 (D.Del.1990) (applying Delaware law); *Fetzer v. Wood,* 211 Ill. App.3d 70, 84, 155 Ill.Dec. 626, 635, 569 N.E.2d 1237, 1246 (1991) ("the jury is in a better position to decide without imposing an expert's theory as to valuation.").

Finally, in order to lay to rest any future confusion over whether a different methodology can make this type of evidence admissible under Rule 702, we believe this issue is similar to that addressed in *Crum v. Ward,* 146 W.Va. 421, 122 S.E.2d 18 (1961). In *Crum,* we held that, from a substantive law standpoint, testimony could not be introduced placing a monetary value on a plaintiff's pain and suffering. As we stated in Syllabus Point 4 of *Crum:* "In the trial of an action for damages for personal injuries based in part on pain and suffering, testimony attempting to place a money value on pain and suffering is inadmissible."

Moreover, not unlike the situation addressed in *Crum,* in *Flannery, supra,* we discussed the question of loss of enjoyment of life in terms of a subjective jury evaluation issue rather than as an objective calculable item:

"Here, however, we have an *element,* a component, of damages that may be considered by a jury in determining the amount of its award. Just as a jury may consider the nature, effect and severity of pain when fixing damages for personal injury, or may consider mental anguish

---

**17.** The Seventh Circuit in an earlier case, *Sherrod v. Berry,* 827 F.2d 195 (7th Cir.1987) (applying Indiana law), approved expert testimony for calculation of economic damages for loss of enjoyment of life. *Sherrod* was reversed, *en banc,* on other grounds. 856 F.2d 802 (7th Cir.1988).

It would appear that *Mercado* settled this issue and, in effect, overruled *Sherrod. See also Southlake Limousine & Coach, Inc. v. Brock,* 578 N.E.2d 677 (Ind.App.1991) (rejecting expert calculations for hedonic damages).

caused by scars and disfigurement, it may consider loss of enjoyment of life." 171 W.Va. at 32, 297 S.E.2d at 438. (Emphasis in original; citations omitted).[18]

Consequently, we conclude that the loss of enjoyment of life resulting from a permanent injury is part of the general measure of damages flowing from the permanent injury and is not subject to an economic calculation.

## II.

### A.

#### Future Dental Expenses

■ The defendant also cites as error the admission of the testimony of the plaintiffs' dental expert, Dr. Leroy Jackson, who testified concerning the future dental expenses that Mr. Wilt would incur. The defendant contends that Dr. Jackson was unable to testify with a reasonable degree of certainty about Mr. Wilt's future dental expenses. The jury awarded Mr. Wilt $5000 under this category of damages. Dr. Jackson stated that while Mr. Wilt had dentures prior to the car accident, those dentures would have to be replaced because, prior to the accident, Mr. Wilt required only a partial-plate denture, and after the accident, he required a full-plate denture. Dr. Jackson testified that, to a reasonable degree of medical certainty, he was certain that Mr. Wilt would require one or two additional upper dentures in his lifetime.[19] Dr. Jackson was not asked to separate the difference between Mr. Wilt's dental impairment before and after the accident.

In Syllabus Point 13 of *Jordan v. Bero, supra,* we stated:

"In an injury case where the manifestations of the permanent injury may be obscure and the extent of the injury itself may be obscure because of its character, positive medical evidence to a degree of reasonable certainty that the injury is permanent is sufficient to take the question to the jury and to support an award of damages for the future effects of such injury."

It is clear that Dr. Jackson testified to a degree of reasonable certainty that Mr. Wilt had suffered a permanent dental injury as a result of the accident. Thus, it was not error for the trial court to allow Dr. Jackson's testimony to be considered by the jury and the jury was free to award damages for the future effects of Mr. Wilt's injury.

### B.

#### Punitive Damages

The jury verdict included an itemized award of $500,000 in punitive damages to each of the plaintiffs. The defendant contends that such a large award of punitive damages was violative of constitutional due process safeguards. The defendant also contends that it was error, under the evidence presented at trial, for the trial court to instruct the jury that driving under the influence of alcohol was evidence of reckless negligence and that punitive damages could be awarded therefor.

■ The instruction given by the trial court regarding driving under the influence of alcohol was as follows: "By statute in W.Va. a person may not drive a vehicle in this State while he is under the influence of alcohol and a person may not drive a vehicle in reckless disregard of the safety of others." The defendant contends that giving such an instruction was error because no direct evidence was admitted at trial to the effect that Mr. Nickelson was intoxicated or driving under the influence of alcohol. We disagree. The instruction given by the trial court is in line with several of our cases where we recognized that a person who drives while under

---

**18.** It should be noted that *Flannery* came to us as certified questions from the Court of Appeals for the Fourth Circuit based on its determination that damages for personal injuries under the Federal Tort Claims Act, 28 U.S.C. § 2671, were to be determined under the state law where the injury occurred. *See Flannery v. United States,* 649 F.2d 270 (4th Cir.1981). After receiving our answers to the certified questions, the Fourth Circuit decided that federal law applied and declined to follow our answers. *Flannery v. United States,* 718 F.2d 108 (4th Cir.1983), *cert. denied,* 467 U.S. 1226, 104 S.Ct. 2679, 81 L.Ed.2d 874 (1984).

**19.** Dr. Jackson testified that the 1991 cost for the type of upper denture needed by Mr. Wilt was $550.

the influence of alcohol in reckless disregard of the safety of others may be subject to an award of punitive damages. *See Hensley v. Erie Ins. Co.,* 168 W.Va. 172, 283 S.E.2d 227 (1981). *Cf. Perry v. Melton,* 171 W.Va. 397, 299 S.E.2d 8 (1982).

█ There was abundant testimony to the effect that Mr. Nickelson had been drinking "Wild Turkey" whiskey shortly before the accident, and that the "Wild Turkey" bottle was between his legs at the time of the accident. Moreover, the investigating police officers noticed an "extreme" smell of alcohol coming from the vehicle, and Mr. Nickelson was observed driving "erratically" and at a "high rate of speed" immediately before the accident. As we stated in Syllabus Point 4 of *Catlett v. MacQueen,* 180 W.Va. 6, 375 S.E.2d 184 (1988):

> " 'If there be evidence tending in some appreciable degree to support the theory of proposed instructions, it is not error to give such instructions to the jury, though the evidence be slight, or even insufficient to support a verdict based entirely on such theory.' Syllabus Point 2, *Snedecker v. Rulong,* 69 W.Va. 223, 71 S.E. 180 (1911)."

Clearly, the evidence presented by the plaintiffs was sufficient to instruct the jury that driving under the influence of alcohol is prohibited by statute in this State, and the trial court did not commit error by giving that instruction.

█ The defendant also contends that the award of punitive damages violated constitutional due process guarantees because the trial court failed to adequately instruct the jury so as to protect the defendant from a punitive award "grossly disproportionate to the severity of the offense or to accomplish society's goals of punishment and deterrence[.]" Our general rule on the adequacy of jury instructions concerning punitive damages was stated in Syllabus Point 13 of *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. ——, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). We find that the jury instruction was adequate under *TXO* and, under this standard, the amount of punitive damages awarded was not improper even if the hedonic damage evidence had been excluded.

## C.

### Prejudgment Interest

█ The defendant argues that the trial court erred when it awarded the plaintiffs prejudgment interest on their award of damages for the loss of household services. There was undisputed testimony at trial that a cousin of Mr. Wilt's performed those services because Mrs. Wilt was unable to do so, and that the cousin accepted significantly less compensation from the plaintiffs than the going rate for those services. The defendant contends that household services are not "special damages" under W.Va.Code, 56–6–31 (1981), and thus prejudgment interest may not be paid on that award. We disagree.

W.Va.Code 56–6–31, states, in pertinent part:

> "[I]f the judgement or decree, or any part thereof, is for special damages, as defined below, or for liquidated damages, the amount of such special or liquidated damages shall bear interest from the date the right to bring the same shall have accrued, as determined by the court. Special damages includes lost wages and income, medical expenses, damages to tangible personal property, and *similar out-of-pocket expenditures,* as determined by the court." (Emphasis added).

█ As we stated in Syllabus Point 1 of *Buckhannon–Upshur County Airport Authority v. R & R Coal Contracting, Inc.,* 186 W.Va. 583, 413 S.E.2d 404 (1991):

> "Prejudgment interest, according to West Virginia Code § 56–6–31 (1981) and the decisions of this Court interpreting that statute, is not a cost, but is a form of compensatory damages intended to make an injured plaintiff whole as far as loss of use of funds is concerned."

It is clear to us that expenditures for household services are included within the phrase "similar out-of-pocket expenditures" used in W.Va.Code, 56–6–31, and prejudgment interest may be awarded under that section. They are out-of-pocket funds the plaintiffs

lost due to the negligence of the defendant's decedent and are intended to make the plaintiffs whole. Thus, household services expenditures are special damages for the purposes of W.Va.Code, 56–6–31, and the trial court did not err by awarding prejudgment interest upon those damages.

### III.

■ Because the hedonic damage evidence was improperly admitted, this case must be remanded. We recognized in Syllabus Point 3 of *Gebhardt v. Smith*, 187 W.Va. 515, 420 S.E.2d 275 (1992), that where liability has been clearly established and, on appeal, error has been found to have occurred, a new trial may be awarded on that issue alone:

" 'Rule 59(a), [West Virginia Rules of Civil Procedure], provides that a new trial may be granted to any of the parties on all or part of the issues, and in a case where the question of liability has been resolved in favor of the plaintiff leaving only the issue of damages, the verdict of the jury may be set aside and a new trial granted on the single issue of damages.' Syl. pt. 4, *Richmond v. Campbell*, 148 W.Va. 595, 136 S.E.2d 877 (1964)."

In *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986), the jury awarded damages in the amount of $10 million in a wrongful death claim of a two-and-one-half-year-old child. We found the award excessive and remanded the case with directions to the circuit court "to enter a remittitur of $7,000,000 and enter judgment on the verdict for $3,000,000 or, in the alternative, at the option of the plaintiff, to award a new trial." 176 W.Va. at 504, 345 S.E.2d at 804.

Another approach was taken in *Harless v. First National Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982). There, the jury returned a verdict in a personal injury case, which was broken down into various components. Upon analyzing the various damage components of the award, we found that some were not legally authorized under the facts of the case. The total award of damages was $80,000; however, we determined that the correct award should have been $25,000 and came to this conclusion:

"We, therefore, accord the right of remittitur to the plaintiff on the basis that he may accept within forty-five days from the mandate of this Court a judgment of $25,000 together with interest thereon from the date of the jury verdict against the Bank and Wilson or the judgment will be set aside and he shall be entitled to a new trial on the issue of damages." 169 W.Va. at 698, 289 S.E.2d at 706.

■ Thus, these cases illustrate the principle that where liability is clearly established and the jury has made an erroneous over-calculation of damages, a remittitur may be directed on remand. If the plaintiff declines to accept the remittitur, then a new trial will be ordered solely on the issue of damages.

Consequently, we conclude that because the plaintiffs offered substantial evidence supporting all their damage claims except for Mrs. Wilt's claim for loss of enjoyment of life, which was assessed separately by the jury, we remand the case with instructions that if the plaintiffs wish to remit the hedonic damage award, judgment may be entered on the remaining damages.[20] If not, then the plaintiffs may have a new trial on the damage issue alone because liability clearly has been established.[21]

---

**20.** The jury's award to Mrs. Wilt, without the hedonic damage component, was $88,387.57 for hospital, doctor, and medical expenses and an additional $30,000 for such future expenses. Additionally, she received $25,000 for future pain and suffering, and $120,000 for past and future loss of household services. These compensatory damages totaled $263,387.57. The hedonic damage award was $225,000. When these latter damages are removed, there is still an adequate basis to sustain the $500,000 punitive damage award for Mrs. Wilt under *TXO Production Corp. v. Alliance Resources Corp.*, *supra*. The same is

true of Mr. Wilt who received compensatory damages in the amount of $44,973.84 and punitive damages of $500,000.

**21.** Other jurisdictions have recognized the power of an appellate court to reverse a judgment in regard to only that portion of the judgment that is in error. In particular, they have held, as is the case here, that a judgment may be reversed on a portion of compensatory damages while sustaining an award for punitive damages. *See Kerr v. First Commodity Corp.*, 735 F.2d 281 (8th

Therefore, the judgment of the Circuit Court of Jefferson County is affirmed, in part, reversed, in part, and remanded.

Affirmed, in part; reversed, in part; and remanded.

NEELY, Justice, concurring:

I concur in the judgment. I cannot join the opinion of the Court, however, because I believe that *W.Va.R.Evid.*, Rule 702 should be applied differently in civil and criminal cases.

In the case before us—a civil case—the majority applied *W.Va.R.Evid.*, Rule 702 in determining whether the specialized knowledge of the plaintiffs' expert, economist Michael Brookshire, Ph.D., was relevant to the calculation of damages for the plaintiffs' loss of enjoyment of life resulting from a car collision. Because Dr. Brookshire's analysis lacked a detailed explanation of the underlying methodology on which it was based and, moreover, relied in large part on assumptions that "appear[ed] to controvert logic and good sense," the majority correctly excluded the testimony as irrelevant. Basically the majority is saying that the proffered expert is a witch doctor. So far, so good and I agree.

The majority, however, failed to make a critical distinction between civil and criminal cases. This is not surprising. In the real world, far more attention is paid to civil, as opposed to criminal, cases. Judges, few of whom lack political agendas, commonly come from the plaintiffs' bar because the plaintiffs' bar is more politically active than the defendants' bar and plaintiffs' lawyers have human friends and not just corporate clients. But

even former defendants' lawyers grow more pro-plaintiff the longer they serve on the bench because they understand the extraordinary advantages that the litigation process itself accords to defendants.

Judges try to make general rules to give an impartial and objective appearance even when the problem they are trying to solve does not really admit to solution through a "general" rule. The mistake in all civil plaintiff-driven Rule 702 jurisprudence is the failure to recognize that there are different imperatives in civil and criminal law and that these imperatives must be accommodated if law is to avoid being a tale told by an idiot. Thus, civil law imperatives should not render an irrational result in criminal laws simply because it is difficult to explain or unpleasant to recognize how the real world works.[1] To explain and accommodate the real world requires nothing more than a willingness to discard cant.

*W.Va.R.Evid.*, Rule 702 adopts a liberal stance on admitting expert testimony and favors admissibility by investing trial judges—to wit, predominantly pro-plaintiff trial judges—with broad discretion to admit expert testimony. Indeed, the United States Supreme Court in *Daubert v. Merrill Dow Pharmaceuticals*, 509 U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) found that the Rules of Evidence superseded the comparatively stringent *Frye* "general acceptance" test for the admission of expert scientific evidence.[2] However, the *Daubert* majority also seemed to expand further the gatekeeping role of trial judges by requiring them to assess the evidentiary reliability of proffered scientific evidence. In other words, no *Frye*

Cir.1984); *Flame Coal Co. v. United Mine Workers*, 303 F.2d 39 (6th Cir.), *cert. denied*, 371 U.S. 891, 83 S.Ct. 186, 9 L.Ed.2d 125 (1962); *Higginbotham v. O'Keeffe*, 340 S.W.2d 350 (Tex. Civ.App.1960). *See generally*, 97 A.L.R.2d 1145 (1964 & Supps.1983 & 1993); 5 C.J.S. *Appeal & Error* § 928 (1993); 5 Am.Jur.2d *Appeal & Error* § 940 (1962 & Supp.1993).

1. In reality, general rules created by judges to achieve political ends are far more damaging than the average Third World dictator who simply says, as he places the noose around some political enemy's neck, "I really don't like you."

At least the dictator does not end up killing a bunch of his friends or even a bunch of strangers he has never met.

2. *Frye v. United States*, 54 App.D.C. 46, 293 F. 1013 (1923). In neither the language of Rule 702 nor in the Advisory Committee notes that accompany it is the *Frye* rule mentioned, much less explicitly overturned. Indeed, the rule itself, requiring only that expert testimony assist the trier of fact in order to be admissible, is so vague as to be amenable to both pro-plaintiff and pro-defendant interpretations.

test, but no guys with bones through their noses casting colored stones either.

The ordinary civil defendant—typically an insurance company—commonly has at its disposal far more funds and resources than the ordinary civil plaintiff. More important, defense counsel favor prolonging litigation year after year to settling because defense counsel are paid to vomit mindless paperwork and discover 'til the cows come home, not to win. At trial, the defense can afford a national expert whose testimony is a shoo-in for admissibility, while the plaintiff may need to settle for a total hack whose techniques will raise *Daubert*-type objections, but who is local, cheap and not unduly sicklied o'er with the pale cast of thought.

By liberalizing the admissibility standard for expert testimony, Rule 702 in effect, then, achieves three ends: (1) it pushes the boundary of admissibility back to embrace comparatively more "junk science" testimony and thus validates a trial judges' admission of testimony by almost any hack; (2) it counterbalances the drag-the-case-out, hourly billing, pro-litigation bias on the defendants' side; and (3) it makes it easier for plaintiffs to produce enough evidence, courtesy of hacks, to get past the dam of summary judgment and nit-picking, lengthy scientific arguments to the safe harbor of plaintiff-sympathetic juries. This in turn impels defendants to settle, rather than to face such juries, which allows judges long lunches and frequent golf outings.

Criminal cases under Rule 702, however, are governed by a different set of political, sociological, and structural imperatives. Currently, the criminal defense bar is populated in general by (1) high-quality young people who are overworked, underpaid and suffer from a high burnout rate; (2) good lawyers who take cases only because they're appointed and forced to do so; and (3) a plethora of marginally competent, bottom-of-the-class nincompoops who volunteer for criminal appointments in order to eke out a meager living in a highly competitive world. In effect, Rule 702 places the burden of rebuttal on the party opposing admissibility, typically the defendant in a criminal case who, in contrast to a civil defendant, lacks the economic muscle or even the creative lawyering necessary to marshal scientific witnesses for a battle of the experts.

Notwithstanding the broad boundaries of Rule 702, there are, at least theoretically, limits to the admissibility of expert scientific testimony: as the case before us now illustrates, courts at least have the sense to toss out egregious rubbish like that of Dr. Brookshire's. The problem in criminal cases, however, is that the *prosecution*, unlike the defendant, has ready access to expert witnesses and fabulous laboratory facilities. Thus, a surprising number of novel techniques gain admissibility without the presentation of defense expert testimony because a criminal defendant often cannot afford to hire even a good Zulu witch doctor, whose fees and travel costs would exceed guidelines for such things.

What tends to obfuscate this phenomenally pervasive problem in the criminal system is the fact that an ordinary street criminal with a little money can usually grind the whole criminal prosecution process to a halt by hiring one of the few members of the private bar who specializes in *paid* criminal cases and is competent. A prosecutor can't afford to waste lots of valuable resources fiddling around with a knowledgeable and competent middle-aged lawyer, so he cuts a deal and moves on. But those dynamics apply only to *ordinary* crime—crime, in other words, where the visibility and publicity won't get the prosecutor appointed federal judge, or elected governor or United States senator.

Once, however, a crime of fashion such as rape, child diddling or low-level political corruption is publicized, the prosecutor will devote *every single resource* in his or her office to the case because *that* prosecution advances the personal agenda of the prosecutor. After all, the truly great corruption is not the penny ante peculations of two-bit politicians, but the surpassing corruption that occurs when a whole bureaucracy prostitutes itself through trading for its own account.

Bigger budgets, greater staff, more computers, higher government salaries, increased prestige and improved job longevity will take all the self-proclaimed righteous, anti-corruption, good government enthusiasts and, in the space of one nanosecond, turn them into salivating whores.[3]

Therefore, to say that the State is actually at a disadvantage in the prosecution of run-of-the-mine felonies is true; but to say that the prosecution can spend millions of dollars to get one poor, politically unpopular, impoverished and friendless defendant is equally true and that is as it was in the beginning, is now and ever shall be world without end. Which is why judges must protect the public from bureaucracies that are corrupt and will trade for their own accounts.[4]

Expert witness Pam Rockwell epitomizes all the problems that a plaintiffs' bar-driven interpretation of Rule 702 presents in criminal cases. In a recent high-profile criminal case, Ms. Rockwell, a sexual assault counselor with a bachelor's degree and a self-proclaimed "advocate for victims," testified from her meetings with sexual assault victims that their behavior was consistent with having been sexually assaulted. *State v. Delaney,* 187 W.Va. 212, 218, 417 S.E.2d 903, 909 (1992) (Neely, J., dissenting).[5] Ms. Rockwell delivered her testimony for the prosecution without inquiring into the children's backgrounds concerning other possible causes for abnormal behavior and without talking to anyone who knew them before the assaults. That Ms. Rockwell admitted she was not neutral, that she was not a trained psychologist or psychiatrist, that she failed to ask the most basic questions that one would think any competent person (not just an expert) would ask if that person really were interested in finding the truth instead of advancing a cause did not faze the lower court or this Court on appeal. Ms. Rockwell's testimony was not only admitted, but proved to be damning. This Court then affirmed, citing Rule 702.

In *Galileo's Revenge: Junk Science in the Courtroom,* 16 (1991), Peter Huber elaborates on the pamrockwellization of expert testimony precipitated by Rule 702:

> Today, virtually any doctor armed with a medical degree is qualified to testify. Sometimes he will be expected to assert that his opinion has a "reasonable basis," that it does not originate in chicken entrails or phases of the moon, but this is nót much of a standard. He need not be a recognized authority or specialist. He need not reconcile his opinions with public-health statistics of epidemiology. He need not establish that his diagnostic methods or logical leaps enjoy "general acceptance" among other doctors. Quite the contrary:

---

3. Bureaucratic self-dealing involves every bit as much indifference to duty and to the most elementary obligations of honesty and humane conduct as regular bribery, but because bureaucratic self-dealing is so difficult to prove, it has never been made illegal. The corrupt bureaucratic self-dealer (i.e., thief) can always trot out the defense "I was only doing my job," or better yet, "I was simply following orders." For greater elaboration on courts' obligations to ferret out this type of corruption, *see* Neely, *How Courts Govern America* 79–114 (1980).

4. Take, for example, the trials and tribulations endured by Glen Dale Woodall (the fabulously well-publicized, alleged Barboursville Mall rapist), all caused by the unscrupulous workings of the State. In 1987, Mr. Woodall was convicted of multiple felonies, including two counts of sexual assault, and sentenced to a prison term of 203 to 335 years. Mr. Woodall was convicted on the basis of Trooper Fred Zain's scientific analysis of semen recovered from the victims as identi-

cal to that of Mr. Woodall's. Although Mr. Woodall's conviction was affirmed on appeal, DNA testing ordered by this Court conclusively established that he could not have been the perpetrator. In 1992, Mr. Woodall's conviction was overturned by the trial court, and Mr. Woodall was awarded his freedom. *State v. Woodall,* 182 W.Va. 15, 385 S.E.2d 253 (1989). In *Matter of W.Va. State Police Crime Lab,* 190 W.Va. 321, 438 S.E.2d 501 (1993), this Court chronicled Trooper Zain's long history of falsifying evidence as a serology expert in criminal cases to obtain convictions for the prosecution. We further noted that Trooper Zain's false testimony was the result of systematic practice rather than an occasional inadvertent error.

5. *See also State ex rel. Spaulding v. Watt,* 188 W.Va. 124, 128, 423 S.E.2d 217, 221 (1992) (Neely, J., dissenting); *State v. Walter,* 188 W.Va. 129, 132–35, 423 S.E.2d 222, 225–28 (1992) (Neely, J., concurring).

he may insist that he alone among doctors understands the importance or origins of certain symptoms. He may claim, in short, to be a new Galileo, a lonely, misunderstood genius who can see wonders that others neither discern or understand. The standards are almost equally loose for other, nonmedical experts.

Plainly, the fate of a criminal defendant should not hang on his ability to rebut scientific evidence when the expert may be testifying on the basis of an unproved hypothesis arrived at in an isolated experiment. Yet unlike the days when my grandfather and uncle were at the bar, there is no longer a politically active, responsible group of lawyers who understand the gross inequities wrought by the application of Rule 702 as interpreted in civil cases to criminal cases and who are willing to make the necessary political noise and expend the necessary political capital to draw attention to them. Still, if it is no longer the work of the organized bar to protect criminal defendants, it is still the work of the courts.

Accordingly, I would advocate a return to the more stringent *Frye* standard as a gloss on Rule 702 in criminal cases. Under the *Frye* standard, a hearing is required to determine scientific acceptance of new tests before the evidence can be admitted; the burden thus is cast upon the proponent of the test to demonstrate its scientific reliability. In placing a special burden on the prosecution rather than the outresourced, outfunded defendant, the *Frye* test will assure that a minimal reserve of experts exists who can critically examine the validity of a scientific determination in a particular case and will eliminate at least the most egregious pamrockwellesque experts.