569 S.E.2d 204

**STATE of West Virginia EX REL. Dorsey WISEMAN and Harriet C. Wiseman, Petitioners,**

v.

**Honorable John L. HENNING, Jr., Judge of the Circuit Court of Randolph County, Charles E. Stanley and Atha Trucking, Inc., a West Virginia corporation, Respondents.**

No. 30313.

Supreme Court of Appeals of West Virginia.

Submitted April 2, 2002.

Decided July 2, 2002.

James R. Fox, Jory & Smith, Elkins, West Virginia, for petitioners.

John Greg Goodykoontz, Amy M. Smith, Steptoe & Johnson, Clarksburg, West Virginia, for respondents, Charles E. Stanley and Atha Trucking, Inc.

PER CURIAM.

In the instant case, the petitioner seeks a writ of prohibition to halt the enforcement of an order of the Circuit Court of Randolph County granting a motion *in limine* that prevented the petitioner's main expert witness on causation and damages from testifying. The circuit court concluded that the proffered scientific opinion of the petitioner's main witness was unreliable.

As set forth below, we grant the requested writ of prohibition.

I.

On September 13, 1996, petitioner Dorsey Wiseman suffered injuries to his left rib cage when his car was struck by a tractor trailer driven by the respondent, Charles E. Stanley, and owned by respondent Atha Trucking. Mr. Wiseman sought treatment at a local hospital for the severe pain in his ribs caused by the impact. Subsequent diagnos-

tic tests, including a biopsy performed on October 30, 1996, were negative for a cause of the recurrent pain.

A second biopsy was performed on December 5, 1996, and revealed the existence of "plasmacytoma" at the exact site of the initial trauma to Mr. Wiseman's rib cage. Plasmacytoma refers to abnormal plasma cells, and is a diagnostic indicator for myeloma, a cancer of the bone marrow.

Mr. Wiseman sought treatment at the Cleveland Clinic where he came under the care of Dr. Mohamad Hussein. Dr. Hussein was director of the Cleveland Clinic Foundation Myeloma Program, and was a member of several national cancer research societies. The Myeloma Program is apparently the third largest in the country, and has treated approximately 477 patients with myeloma and other similar conditions.

Mr. Wiseman was subsequently diagnosed with multiple myeloma, and was informed that his life expectancy was significantly diminished. The life expectancy of a person diagnosed with multiple myeloma is three to five years.

Of the many individuals treated by the Cleveland Clinic for myeloma, at least five of those individuals suffered "trauma-induced myeloma." Other hospitals, such as the Mayo Clinic, had similarly found myelomas and plasmacytomas at the site of traumas. Apparently, there is medical evidence to the effect that trauma to individual cells of the body can cause localized plasmacytomas, and those plasmacytomas can develop into multiple myeloma in a short period of time.

After treating Mr. Wiseman's condition, Dr. Hussein concluded that Mr. Wiseman's myeloma was a result of the rib cage injury suffered in the collision with respondent Mr. Stanley. Dr. Hussein's affidavit states:

It is my opinion to a reasonable degree of medical probability that Dorsey Wiseman suffers multiple myeloma as a result of the September 13, 1996 accident. This conclusion is based upon research [with many groups] ..., my treatment of a substantial number of patients, the history and treatment of Dorsey Wiseman, various laboratory results for Mr. Wiseman, articles published by other specialists and my collaboration with physicians concentrating solely upon the research and treatment of multiple myeloma.

The petitioners, Mr. Wiseman and his wife Harriet, subsequently filed a lawsuit against respondents Mr. Stanley and Atha Trucking, alleging that the respondents' negligence was a proximate cause of Mr. Wiseman's myeloma. Prior to trial, scheduled for May 30, 2000, the respondents filed a motion *in limine* seeking to exclude Dr. Hussein's testimony that Mr. Wiseman's myeloma occurred as a result of the injuries sustained in the collision.

On May 25, 2000, the circuit court entered an order granting the respondents' motion *in limine* to exclude Dr. Hussein's testimony. The circuit court concluded that "there is no evidence to support that the proposed testimony by Dr. Hussein is anything more than a possible or potential causal link." The circuit court believed that Dr. Hussein's opinion could "show no basis in established scientific knowledge because it has not been subjected to testing, peer review or publication, an established error rate, controlling standards, or a general acceptance in the scientific community[.]"

After several procedural delays,[1] the petitioners filed the instant petition for a writ of prohibition with this Court, contending that by excluding Dr. Hussein's testimony, the circuit court had exceeded its legitimate au-

---

1. The petitioners initially asked the circuit court to reconsider its decision, and filed scientific articles with the circuit court which supported Dr. Hussein's testimony. The circuit court, in an order dated October 23, 2000, again concluded that "his theory has not been demonstrated to be valid enough to permit the testimony and that there is not sufficient scientific basis for the testimony."

The petitioners then filed a petition for appeal with this Court, but upon the respondents' motion the appeal was dismissed with leave to seek extraordinary relief. Additionally, an Ohio court declared the respondents' insurance carrier to be insolvent, and issued an order staying any proceedings. The instant petition was not filed with this Court until December 4, 2001.

thority and eliminated the petitioners' ability to prove damages and causation.

## II.

We must first determine whether prohibition is appropriate in the instant case. "[W]rits of prohibition ... provide a drastic remedy to be invoked only in extraordinary situations." *State ex rel. Allen v. Bedell*, 193 W.Va. 32, 37, 454 S.E.2d 77, 82 (1994) (Cleckley, J., concurring). More specifically,

> ... this Court will use prohibition ... to correct only substantial, clear-cut, legal errors plainly in contravention of a clear statutory, constitutional, or common law mandate which may be resolved independently of any disputed facts and only in cases where there is a high probability that the trial will be completely reversed if the error is not corrected in advance.

Syllabus Point 1, in part, *Hinkle v. Black*, 164 W.Va. 112, 262 S.E.2d 744 (1979).

There are five factors that this Court will consider in determining whether to issue a writ of prohibition:

> In determining whether to entertain and issue the writ of prohibition for cases not involving an absence of ·jurisdiction but only where it is claimed that the lower tribunal exceeded its legitimate powers, this Court will examine five factors: (1) whether the party seeking the writ has no other adequate means, such as direct appeal, to obtain the desired relief; (2) whether the petitioner will be damaged or prejudiced in a way that is not correctable on appeal; (3) whether the lower tribunal's order is clearly erroneous as a matter of law; (4) whether the lower tribunal's order is an oft repeated error or manifests persistent disregard for either procedural or substantive law; and (5) whether the lower tribunal's order raises new and important problems or issues of law of first impression. These factors are general guidelines that serve as a useful starting point for determining whether a discretionary writ of prohibition should issue. Although all five factors need not be satisfied, it is clear that the third factor, the existence of clear error as a matter of law, should be given substantial weight.

Syllabus Point 4, *State ex rel. Hoover v. Berger*, 199 W.Va. 12, 483 S.E.2d 12 (1996).

Applying these factors, we find that the petitioner has no plain, speedy, and adequate remedy in the ordinary course of law. The petitioners contend that the trial court's ruling is clearly erroneous as a matter of law. As a result of the trial court's ruling, both parties would be compelled to go through an expensive, complex trial and appeal from a final judgment, and we determine there is a high likelihood of reversal on appeal. The unreasonableness of the delay and expense is apparent. The remedy of appeal is usually deemed inadequate in these situations, and prohibition is therefore allowed.

The petitioners contend that the circuit court improperly excluded the testimony of Dr. Hussein. Our standard for evaluating the testimony of an expert is stated in Rule 702 of the *West Virginia Rules of Evidence*, which permits opinion testimony by an expert when the witness is "qualified as an expert by knowledge, skill, experience, training, or education," and "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue[.]"

We held in *Gentry v. Mangum*, 195 W.Va. 512, 524, 466 S.E.2d 171, 183 (1995), that Rule 702 has three requirements regarding the admission of expert testimony:

> Rule 702 has three major requirements: (1) the witness must be an expert; (2) the expert must testify to scientific, technical or specialized knowledge; and (3) the expert testimony must assist the trier of fact.

However, "[t]horny problems of admissibility arise when an expert seeks to base his or her opinion on novel or unorthodox techniques that have yet to stand the test of time to prove their validity." 195 W.Va. at 520, 466 S.E.2d at 179.

In *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), we held that circuit judges have the discretion and authority under the *Rules of Evidence* to determine whether scientific expert testimony is "trustworthy, even if the technique involved has not yet won general scientific acclaim." *Gentry*, 195

W.Va. at 521, 466 S.E.2d at 180. We therefore held, in Syllabus Point 2 of *Wilt*, that:

In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

■ We elaborated on and clarified the admissibility standard for scientific expert testimony in *Gentry*, where we made clear in Syllabus Point 4 that a circuit court can admit scientific expert testimony so long as it is both reliable and relevant:

When scientific evidence is proffered, a circuit court in its "gatekeeper" role under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993), *cert denied*, 511 U.S. 1129, 114 S.Ct. 2137, 128 L.Ed.2d 867 (1994), must engage in a two-part analysis in regard to the expert testimony. First, the circuit court must determine whether the expert testimony reflects scientific knowledge, whether the findings are derived by scientific method, and whether the work product amounts to good

science. Second, the circuit court must ensure that the scientific testimony is relevant to the task at hand.

■ Applying our holding in Syllabus Point 4 of *Gentry*, the parties in the instant case do not appear to dispute the relevance of Dr. Hussein's testimony. Instead, the parties dispute the reliability of his opinion. We therefore focus our attention on this factor alone.

■ When a trial court examines the reliability of an expert's scientific testimony, the court should examine the soundness of the principles or theories, and the reliability of the process or method used to derive those principles or theories. "The problem is not to decide whether the proffered evidence is right, but whether the science is valid enough to be reliable." *Gentry*, 195 W.Va. at 523, 466 S.E.2d at 182.

Examining the record in the instant case, we believe that the circuit court exceeded its authority in its decision to exclude the testimony of Dr. Hussein.[2] The record reflects that Dr. Hussein was a member of several specialized cancer research societies, and had substantial interaction with other cancer specialists. He was a specialist in cancers such as that suffered by Mr. Wiseman, and was director of the Myeloma Program at the Cleveland Clinic. Dr. Hussein's proffered opinion that multiple myeloma can result from a trauma was based upon: his extensive treatment of Mr. Wiseman; his treatment of five other patients at the Cleveland Clinic who had trauma-induced myelomas; his study of the physiological process of tissue injury causing chronic inflammation and overstimulation of cells, which triggers the growth of cancerous cells; his interaction with other specialists who also believe that

---

**2.** The petitioners also argue that Dr. Hussein should have been allowed to testify simply because he was Mr. Wiseman's treating physician. We agree with the petitioners' argument that the testimony of a treating physician is qualitatively different from that of a physician hired solely to testify. As one court stated, in refusing to apply a "gatekeeper" analysis to a treating doctor's testimony:

This does *not* mean ... that we believe the practice of medicine, including psychiatry, is

not based on science. Rather, it means that expert evidence based on a qualified witness' own experience, observation, and study is treated differently from opinion evidence based on novel scientific principles advanced by others.

*Logerquist v. McVey*, 196 Ariz. 470, 480, 1 P.3d 113, 123 (2000). However, as we base our resolution of this case on other factors, we decline to analyze the qualitative distinctions contained in a treating physician's expert opinion.

trauma can trigger the occurrence of myeloma; and the handful of published studies by other cancer centers that have identified local tissue injury, including a bone fracture, as a risk factor for causing multiple myeloma.

■ We recognize that Dr. Hussein's opinion is novel and unorthodox, and may not have yet received, as the circuit court found, "general acceptance in the scientific community." However, the *Rules of Evidence* do not require that a scientific opinion be "generally accepted," because such a requirement is "at odds with the liberal thrust of the ... Rules and their general approach of relaxing the traditional barriers to opinion testimony." *State v. Leep*, 212 W.Va. 57, ——, 569 S.E.2d, 133, 141 (2002) (citations and internal quotations omitted). The record suggests a substantial degree of reliability underlying the formation of Dr. Hussein's opinion. Accordingly, we find that the circuit court erred in excluding his testimony on the basis that it showed only a "possible or potential causal link" between the respondents' alleged negligence and Mr. Dorsey's injury. The proffered opinion is "valid enough to be reliable;" whether "the proffered evidence is right" is a question for the finder of fact. *Gentry*, 195 W.Va. at 523, 466 S.E.2d at 182.

### III.

The requested writ of prohibition is granted, and the circuit court is precluded from enforcing its May 25, 2000 order.

Writ Granted.

MAYNARD, Justice, dissenting.

I would have denied the writ of prohibition because I do not believe that the trial court's order preventing the petitioner's expert witness from testifying constitutes a substantial, clear-cut, legal error.

Syllabus Point 2 of *Wilt v. Buracker*, 191 W.Va. 39, 443 S.E.2d 196 (1993) states:

In analyzing the admissibility of expert testimony under Rule 702 of the West Virginia Rules of Evidence, the trial court's initial inquiry must consider whether the testimony is based on an assertion or inference derived from the scientific methodology. Moreover, the testimony must be relevant to a fact at issue. Further assessment should then be made in regard to the expert testimony's reliability by considering its underlying scientific methodology and reasoning. This includes an assessment of (a) whether the scientific theory and its conclusion can be and have been tested; (b) whether the scientific theory has been subjected to peer review and publication; (c) whether the scientific theory's actual or potential rate of error is known; and (d) whether the scientific theory is generally accepted within the scientific community.

The totality of the majority's reasoning for finding that Dr. Hussein's testimony is scientifically reliable is as follows:

The record reflects that Dr. Hussein was a member of several specialized cancer research societies, and had substantial interaction with other cancer specialists. He was a specialist in cancers such as that suffered by Mr. Wiseman, and was director of the Myeloma Program at the Cleveland Clinic. Dr. Hussein's proffered opinion that multiple myeloma can result from a trauma was based upon: his extensive treatment of Mr. Wiseman; his treatment of five other patients at the Cleveland Clinic who had trauma-induced myelomas; his study of the physiological process of tissue injury causing chronic inflammation and overstimulation of cells, which triggers the growth of cancerous cells; his interaction with other specialists who also believe that trauma can trigger the occurrence of myeloma; and the handful of published studies by other cancer centers that have identified local tissue injury, including a bone fracture, as a risk factor for causing multiple myeloma.

First, we see that Dr. Hussein has treated Mr. Wiseman and "five other patients at the Cleveland Clinic who had trauma-induced myelomas." This is not helpful to our analysis because six myeloma patients are not a sufficient number to constitute a representative scientific sample. Further, the assertion that these six patients had trauma-induced myelomas begs the question before the trial

court. Second, although there is evidence that Dr. Hussein has studied the physiological process of tissue injury and the growth of cancerous cells, that is no evidence that Dr. Hussein's study has been subjected to peer review and publication or whether his theory's actual or potential rate of error is known. Finally, while there is evidence that other specialists believe Dr. Hussein's theory, and that "a handful" of published articles espouse the theory, it is undisputed that the theory is not generally accepted within the scientific community.

In sum, I believe that the circuit court properly excluded Dr. Hussein's proffered testimony as unreliable in light of the five factors set forth above. Accordingly, I dissent.