686 S.E.2d 623

**Michelle JONES, in her Capacity as Administratrix of The Estate of Julia Toler, Deceased, Plaintiff Below, Appellant**

v.

**Edward R. SETSER, M.D., and Huntington Cardiothoracic Surgery, Inc., Defendants Below, Appellees.**

**No. 34619.**

Supreme Court of Appeals of West Virginia.

Submitted Oct. 6, 2009.

Decided Nov. 13, 2009.

---

Marvin W. Masters, Richard A. Monahan, The Masters Law Firm, Charleston, WV, for the Appellant.

D.C. Offutt, Jr., Cheryl A. Eifert, Offutt, Fisher & Nord, Huntington, WV, for the Appellees.

PER CURIAM.

Michelle Jones, as administratrix of the estate of Julia Toler, appeals from the denial of her motion to set aside an adverse verdict in a medical malpractice case and her motion to obtain sanctions against defense counsel. The grounds upon which Appellant (sometimes referred to as "plaintiff") seeks both a

new trial and sanctions involve allegedly improper comments that defense counsel made during closing argument and certain demonstrative aids offered in support of that argument. Upon our review of the record of this case, we are convinced that the arguments of defense counsel combined with the use of the referenced demonstrative aids wrongfully injected prejudice into the trial of this case. Consequently, we determine that the trial court abused its discretion in refusing to grant a mistrial in this case. The decision of the trial court is reversed and this matter is remanded for a new trial.

## I. Factual and Procedural Background

Sixty-one-year-old Julia Toler underwent her second open heart surgery in 1999 for the purpose of mitral valve replacement.[1] During the course of the sternum separation necessary to perform the surgery, Appellee Dr. Edward R. Setser (sometimes referred to as "defendant") encountered massive bleeding. The bleeding was caused by a tear in the aorta, a common complication of the procedure. Despite being placed on heart bypass during the aortic repair, Ms. Toler suffered a deprivation of oxygen which in turn caused irreversible brain damage. Until her death in January 2003, Ms. Toler remained in a semi-comatose state.

In 2001, Appellant filed a cause of action against Dr. Setser and his employer, Huntington Cardiothoracic Surgery, Inc.,[2] wherein she alleged that Dr. Setser negligently performed the mitral valve replacement surgery on Ms. Toler. When this case went to trial on May 19, 2008, Appellant's expert, Dr. Steven Herman,[3] testified that Dr. Setser should have performed a preoperative CT scan of the chest. Had he done this, according to Dr. Herman, he would have recognized

that the space between the sternum and the aorta was inadequate to permit the procedure to be performed without complications. Given this knowledge, Dr. Herman stated that Dr. Setser should have placed Ms. Toler on heart-lung bypass prior to opening the sternum or exposed the femoral artery so that bypass could be achieved quickly in the event of a resulting complication.

Appellee's expert witness, Dr. Karl Krieger, opined at trial that Dr. Setser had met the relevant standard of care. Specifically, he testified that the preoperative x-ray indicated there was adequate space between the sternum and the aorta to permit the surgical procedure. He further offered his explanation that the aortic tear resulted from a disruption of scar tissue from the previous open heart surgery—something that would not have been visible on either an x-ray or a CT scan. In addition, Dr. Krieger testified that both the preoperative work and Dr. Setser's response to the hemorrhage that resulted during surgery were performed in accordance with the required standard of care.

Appellant states that the trial of this case proceeded without error until the closing minutes of Appellee's closing argument. At this juncture, defense counsel who was utilizing a "power point" presentation to enhance his argument, placed on the screen a cartoon from the "Wizard of Id" comic strip.[4] The cartoon, which had run the day before [5] in the *Huntington Herald Dispatch* had three frames: in the first, a woman is seated at the table of a fortune teller whose hands are placed on a crystal ball while saying "I've made contact with your recently departed Uncle Ned"; in the second frame, the woman questions the fortune teller, saying "You

---

1. Ms. Toler contracted rheumatic fever as a child and, as a result, had a history of heart valve disease. In 1980, she had open heart surgery to correct a defect in the mitral valve. In 1999, Ms. Toler underwent a diagnostic cardiac catheterization which confirmed the presence of severe mitral valve stenosis.

2. Because Dr. Setser's employer was sued based solely on a theory of vicarious liability, Dr. Setser is the primary defendant. For ease of reference, we refer to Dr. Setser as the singular defendant/appellee in this opinion.

3. Dr. Herman became the plaintiff's expert witness after her original medical expert was indicted by a federal grand jury in Michigan for perjury, mail fraud, and wire fraud in connection with allegedly providing false testimony in a medical malpractice action.

4. The cartoon appears in the appendix to this opinion.

5. Thursday, May 22, 2008.

have? What did he say?"; and in the final frame, the fortune teller responds "He wants you to sue the doctor." Concurrent with the viewing of this cartoon, defense counsel stated: "I think that this is a reflection of society today where—." When this occurred, Appellant immediately objected and the trial court sustained counsel's objection.

Continuing with his argument, defense counsel asserted that Dr. Setser would have been blamed in the event of a resulting complication regardless of what procedure he had chosen to use on Ms. Toler:

> If Dr. Setser had done what Dr. Herman and Mr. Masters claim he should have done in this case, and cannulated her in advance, and there had been one of these complications, and we would have had a bad outcome—they would have been in here criticizing him for doing an unnecessary procedure, and said, "Well, there's no risk on the CT. There's no risk on the x-ray."

Appellant's counsel objected and the court overruled the objection. Defense counsel proceeded by saying

> So, if any complication occurs, no matter which way Dr. Setser goes, he's going to be criticized for doing the wrong thing, because in hindsight, you can take apart anything and criticize. The doctor is always going to be criticized and held accountable, because we're going to require that doctor to be infallible. You can take a bad result and turn it into a malpractice case every time.

Addressing the availability of quality medical care in the local area, defense counsel remarked: "We're fortunate to have well-trained and caring physicians like him [Dr. Setser], and others in the area, to treat us and our loved ones. If we hold them to an infallible standard, they simply can't practice." As these comments were being made, a slide [6] entitled "Dr. Setser Can't Win" was shown which contained the following statements:

- No Matter What Course He Takes, There Are Going to Be Potential Life Threatening Complications That Can Not Be Avoided
- If One of Those Complications Occur, He is Going to be Criticized For Not Taking the Other Course
- Mr. Masters and his Expert, Dr. Herman, Will Take a Bad Result and Turn it Into Malpractice Every Time

While the jury was deliberating, Appellant's counsel moved for a mistrial based on the use of the "Wizard of Id" cartoon coupled with the referenced remarks defense counsel made during closing argument. In ruling upon the mistrial motion, the trial court found that "the cartoon used by defense counsel during closing argument exceeded the boundaries and limitations of proper argument." Despite this finding, the trial court denied the motion for a mistrial. In explanation of its decision, the trial court noted that it had sustained Appellant's objection to the cartoon. The trial court ruled additionally that the cartoon did not violate the terms of an order entered *in limine* which barred any reference to a medical malpractice crisis or any suggestion that Appellant's case was contributing to an already overburdened court system. In denying the mistrial motion, the trial court also denied Appellant's motion for sanctions.

Through this appeal, Appellant seeks to reverse the trial court's decision not to grant a new trial and not to award it sanctions in connection with actions of defense counsel during oral argument. On cross-appeal, Appellee seeks to introduce the testimony of Dr. Richard Blake, a treating physician of Ms. Toler, without the limitations the trial court imposed on his testimony.

## II. Standard of Review

With regard to our review of matters that were introduced in closing argument, we have recognized that "[t]he discretion of the trial court in ruling on the propriety of argument by counsel before the jury will not be interfered with by the appellate court, unless it appears that the rights of the complaining party have been prejudiced, or that manifest injustice resulted therefrom." Syl. Pt. 3, *State v. Boggs*,

---

6. The slide contents are set forth in the appendix to this opinion.

103 W.Va. 641, 138 S.E. 321 (1927). In reviewing the trial court's decision not to grant a mistrial in this case, we are governed by the following standard:

> We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

*Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 104, 459 S.E.2d 374, 381 (1995). With these standards in mind, we proceed to determine if the trial court's decision not to grant a mistrial was in error.

### III. Discussion

■ We have previously recognized both the purpose and scope of closing argument: "Great latitude is allowed counsel in argument of cases, but counsel must keep within the evidence, not make statements calculated to inflame, prejudice or mislead the jury, nor permit or encourage witnesses to make remarks which would have a tendency to inflame, prejudice or mislead the jury." Syl. Pt. 2, *State v. Kennedy*, 162 W.Va. 244, 249 S.E.2d 188 (1978); *see also* Syl. Pt. 3, *Crum v. Ward*, 146 W.Va. 421, 122 S.E.2d 18 (1961) (holding that "[t]hough wide latitude is accorded counsel in arguments before a jury, such arguments may not be founded on facts not before the jury, or inferences which must arise from facts not before the jury").

■ Appellant contends that the remarks of defense counsel as set forth in the factual section of this opinion were intentionally designed to appeal to the prejudice, passion, and fears of the jury. By arguing that plaintiff's counsel and plaintiff's expert witness would bring a malpractice action in the event of a bad result regardless of which course of treatment was utilized, Appellant maintains that defense counsel wrongly attacked the character, integrity, and credibility of opposing counsel and plaintiff's expert witness. Through remarks that appealed to the juror's personal concerns or fears regarding the continuing availability of medical providers in the community, Appellant argues that defense counsel improperly injected an element of local prejudice and passion into the trial. As an additional ground for seeking a new trial, Appellant contends that the "Wizard of Id" cartoon violated the trial court's pretrial ruling that the medical malpractice crisis could not be addressed during trial.

Appellee takes the position that the cartoon, slide, and rhetoric complained of by Appellant merely conveyed its theory of the case—that all of the medical options involving the decedent's treatment carried risk and regardless of which option was chosen, Dr. Setser would have been criticized (i.e. malpractice suit) in the event of a bad outcome. Rather than violating the trial court's directive to refrain from referring to a medical malpractice crisis, Appellee asserts that the cartoon, slide, and counsel's accompanying comments were solely intended to convince the jury that Ms. Toler's injuries and resultant death were the result of an unpredictable and unpreventable complication of high risk surgery and not negligence on the part of Dr. Setser. In furtherance of its position, Appellee emphasizes that given the minimal time during trial accorded to the cartoon and questioned argument, it is doubtful that they could have had an improper effect on the jury.

Turning first to the content of defense counsel's closing argument, we consider the personalized nature of the attacks counsel made against the integrity and, thus, the credibility of plaintiff's counsel and expert witness. We refer to those comments that addressed the likelihood that Dr. Setser would have been sued by Appellant even if he had followed an alternate course of treatment provided the end result had been the same. While defense counsel orated in a generalized fashion by saying, "you can take a bad result and turn it into a malpractice case every time," the effect of this comment was personalized with the simultaneous showing of a slide that stated: "Mr. Masters and his Expert, Dr. Herman, Will Take a Bad Result and Turn it Into Malpractice Every Time."

When asked to examine the propriety of personalized attacks on opposing counsel and witnesses during closing argument, courts

have had little difficulty determining that such attacks exceed the scope of permissible argument. In *Roetenberger v. Christ Hospital*, 163 Ohio App.3d 555, 839 N.E.2d 441 (2005), the defense counsel criticized plaintiff's expert witnesses during closing argument, "accusing them of 'manipulating' the case and 'participating in th[e] creation of this lawsuit against this good doctor to make all kinds of money.'" *Id.* at 445. Describing one of plaintiff's medical experts as "an idiot" and disparaging his credibility "because he wore 'gym shoes and baggy pants,'" defense counsel argued that a verdict for the plaintiff would reward the plaintiff's greed while his client would be "brand[ed] 'with malpractice for the rest of his life.'" 839 N.E.2d at 445. Defense counsel criticized plaintiff's counsel at length, branding them as heartless, soulless, and entirely motivated by money. He further accused them of trying "every trick in the book," belittled their cross-examination skills, and suggested that returning a verdict in plaintiff's favor "would 'affirm' the behavior of plaintiff's counsel." *Id.* at 445.

Concluding that the personalized attacks on the plaintiff; his counsel; and his witnesses were clearly beyond the scope of final argument, the Ohio court identified the following guidelines which govern the parameters of closing argument:

Closing argument presents counsel with the opportunity to comment on the evidence and the reasonable inferences to be drawn from the evidence. Remarks or arguments that are not supported by the evidence and are designed to arouse passion or prejudice to the extent that there is a substantial likelihood that the jury may be misled are improper. "When argument spills into disparagement not based on any evidence, it is improper." Counsel is obligated to refrain from unwarranted attacks on opposing counsel, the opposing party, and the witnesses. It is the trial court's duty to see that counsel's statements are confined to proper limits and to prohibit counsel from creating an atmosphere of passion and prejudice or misleading the jury. Abusive comments directed at opposing counsel, the opposing party, and the opposing party's witnesses should not be permitted. If there is room for doubt

about whether counsel's improper remarks may have influenced the outcome of the case, that doubt should be resolved in favor of the losing party.

*Roetenberger,* 839 N.E.2d at 446 (citations omitted).

*Berkowitz v. Marriott Corp.,* 163 A.D.2d 52, 558 N.Y.S.2d 511 (1990), is another case in which the inclusion of "an unfair and highly prejudicial attack upon the credibility and competence of defendants' expert witnesses and attorneys" in summation was found to be reversible error. *Id.* at 512. In that case, plaintiff's counsel crossed the line between acceptable and improper closing argument by repeatedly referring to the defense's medical experts as

"hired guns" who were brought into the litigation to "fluff up the case" and "fill up some time", and moreover, their testimony was attacked as having been designed solely to bolster defendants' attorney's "promise to you that he's going to show that there was no reason to obtain physicians from Suffolk County except that they could not locate a physician who would support their case "from here to Suffolk County.... After that, boy, it's Europe."

558 N.Y.S.2d at 512. Based on its conclusion that the plaintiff's counsel's "purpose was undoubtedly to discredit defendants' expert witnesses and attorneys," the appellate court concluded that the summation "could only have been devastatingly prejudicial to defendants and amounted to a violation of their right to a fair trial." *Id.* at 512.

Recognizing as axiomatic the principle that invective and derogation are outside the bounds of summation, the court resolved in *Geler v. Akawie,* 358 N.J.Super. 437, 818 A.2d 402 (2003), that plaintiff's counsel's decision to fill "his closing argument with derisive and derogatory comments regarding defendants, their counsel, their witnesses and their evidence in general" "undoubtedly affected the jury's deliberations." *Id.* at 421. Among the disparaging characterizations plaintiff's counsel made against the defendant's expert witness was that he was "wily and wiggly"; his opinions were alternately described as "cute," "nonsense," "garbage,"

"absurd," and "not worth a hill of beans." 818 A.2d at 421. Counsel went so far as to liken defendant's expert's testimony to "reading the National Enquirer," concluding his analogy by offering that by the end of his testimony you realized that like an Enquirer piece, "it's a joke, and that's what I tell you that Dr. Bodner was in this case." *Id.* at 421.

Addressing the use of "personal, unsubstantiated attacks on the character and ethics of opposing counsel," the Eight Circuit articulated: "These types of statements are highly improper because they improperly encourage the jury to focus on the conduct and role of ... [defendant's] attorney rather than on the evidence of ... [defendant's] guilt." *U.S. v. Holmes,* 413 F.3d 770, 775 (8th Cir.2005). In addition to attacking the character and integrity of plaintiff's counsel and her expert medical witness, defense counsel implied that a plaintiff's verdict could end Dr. Setser's ability to practice medicine locally and reduce the availability of quality medical care in the community in which the jury resided. For the same reasons that derogatory comments and personal attacks on counsel and witnesses are improper, this type of appeal to the jury is similarly not permitted. In *Rush v. Hamdy,* 255 Ill.App.3d 352, 194 Ill. Dec. 477, 627 N.E.2d 1119 (1993), defense counsel's comments that the defendant's "professional reputation was 'on the line' or 'at stake,'" was deemed improper on several grounds. *Id.* at 1123. First, the remarks were outside the scope of the facts in evidence "[s]ince there was no evidence introduced regarding the impact of an adverse verdict upon [Dr.] Hamdy's professional reputation." 194 Ill.Dec. 477, 627 N.E.2d at 1123. Second, the remarks were deemed to have violated an *in limine* ruling which prohibited references to the defendant's ability to practice medicine or his standing in the community. *Id.* at 1123. Even barring such an *in limine* ruling, however, the appellate court opined in *Hamdy* that the comments would have been inappropriate because "[a] reference to the impact of an adverse verdict upon defendant's professional reputation ... interjects an improper element into the case and is little more than an appeal to the passions and sympathy of the jury." 194

Ill.Dec. 477, 627 N.E.2d at 1124; *see also Pederson v. Dumouchel,* 72 Wash.2d 73, 431 P.2d 973, 980 (1967) (remanding for new trial where defense counsel improperly attempted to turn jury into "hometown rooting section" and thereby sought to prejudice jury against out-of-town plaintiff and experts).

■ In the case before us, defense counsel personalized the effects of his rhetoric through the use of demonstrative aids to argue that both Mr. Masters and Dr. Herman were intent on pursuing claims of medical malpractice regardless of whether such claims had merit. The defense's theory was essentially that if death results from medical treatment in a high risk scenario, a malpractice claim was inevitable if Mr. Masters and Dr. Herman were involved in the case. This type of character derogation is clearly outside the bounds of permissible argument in summation. As the court emphasized in *Holmes,* "personal, unsubstantiated attacks on the character and ethics of opposing counsel have no place in the trial of any criminal or civil case." 413 F.3d at 775.

■ As further grounds for seeking a new trial, Appellant asserts that the "Wizard of Id" cartoon, described in the factual section of this opinion and included in the appendix to this opinion, violated the terms of an *in limine* order entered by the trial court. The terms of the order "precluded [defendants] from arguing to the jury about a medical malpractice litigation crisis, or that cases such as plaintiffs' are the reason why the courts are clogged or causing problems with the court system." While the trial court determined that "the cartoon ... exceeded the boundaries and limitations of proper argument," it did not conclude that the cartoon violated the terms of the *in limine* ruling. And, because it sustained plaintiff's objection to the jury's viewing of the cartoon, the trial court decided that a new trial was not warranted.

■ Viewing the cartoon as a clear violation of the *in limine* order, Appellant argues that a new trial is warranted under this Court's decision in *Honaker v. Mahon,* 210 W.Va. 53, 552 S.E.2d 788 (2001). In syllabus point five of *Honaker,* we held that

A deliberate and intentional violation of a trial court's ruling on a motion *in limine*, and thereby the intentional introduction of prejudicial evidence into a trial, is a ground for reversing a jury's verdict. However, in order for a violation of a trial court's evidentiary ruling to serve as the basis for a new trial, the ruling must be specific in its prohibitions, and the violation must be clear.

210 W.Va. at 55, 552 S.E.2d at 790. Whether the cartoon violates the trial court's proscription against referring to a medical malpractice crisis has been the focus of much debate. As stated above, the trial court found the cartoon's use to be improper, but it did not rule that the terms of the *in limine* ruling were violated by the cartoon's exhibition.

■ While there may be disagreement as to whether the cartoon *directly* addresses a medical malpractice crisis, it cannot be argued that the cartoon had any relevance to the evidence before the court. And, given the clear jab at society's penchant for suing doctors, it is difficult to view the cartoon as anything other than an attempt by defense counsel to gain sympathy for Dr. Setser while prejudicing the jury against the plaintiff. Adopting the reasoning employed in *Hamdy*, we conclude that the cartoon's use was improper even barring the existence of an *in limine* ruling because an element of prejudice was wrongly injected into the case. *See* 194 Ill.Dec. 477, 627 N.E.2d at 1124. As a result, we find it unnecessary to make a determination as to whether the cartoon violated the subject pretrial ruling. And, because Appellant's motion for sanctions was tied to his argument that the cartoon violated the *in limine* order, we similarly do not reach the issue of whether sanctions were warranted for violating the order. *See Tennant*, 194 W.Va. at 113, 459 S.E.2d at 390 (stating that "[a] party who violates a motion *in limine* is subject to all sanctions legally available to a trial court, including contempt, when a trial court's evidentiary order is disobeyed"). Despite our decision to concur with the trial judge's decision to deny sanctions, we cannot escape the conclusion that

the decision to include the cartoon as part of summation appears to be a thinly-veiled attempt by defense counsel to inject, albeit through indirect means, references to matters that the trial court had proscribed. We strongly disapprove of this seemingly "back door" method to insert a wrongful element of prejudice into the trial.

■ Seeking to uphold the jury verdict, Appellee argues that Appellant's failure to seek a curative instruction precludes her from seeking a new trial based on the cartoon and questioned argument. The critical importance of raising contemporaneous objections to matters during trial is well-established. *See* Syl. Pt. 6, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945) (holding that "[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a waiver of the right to raise the question thereafter either in the trial court or in the appellate court"). The record in this case reflects that Appellant properly objected to both the cartoon and the accompanying remarks of defense counsel that are raised on appeal. Appellant did not, however, seek any curative instructions from the trial court in connection with these objections.

While this Court has previously held that the failure to both object and seek a curative instruction with regard to improper argument of counsel prevents appellate review of the alleged error,[7] we are compelled to recognize that there are certain instances of error for which a curative instruction is ineffectual. We find the observations of the court in *Geler* instructive on the issue of whether prejudice, once injected into a trial through improper closing argument, can be eradicated:

> We recognize that in some cases prompt curative instructions by the trial judge have been found sufficient to ameliorate the effect of isolated lapses on the part of an attorney in closing argument. . . .

7. *See State v. Guthrie*, 205 W.Va. 326, 336, 518 S.E.2d 83, 93 (1999) (stating that party must object at trial and move for curative instruction to preserve issue of alleged improper closing argument for appeal); Syl. Pt. 6, *McCullough v. Clark*, 88 W.Va. 22, 106 S.E. 61 (1921).

Here, the necessary instructions were not given, thereby magnifying the corrupting effect of counsel's conduct. *We do not suggest that proper instruction could have erased the prejudicial effect of counsel's comments in this case.* "It is beyond refute ... that cautionary instructions do not necessarily remove the probability of prejudice." *Fineman v. Armstrong*, 774 F.Supp. 266, 270 (D.N.J.1991), *aff'd* 980 F.2d 171 (3d Cir.1992).

[T]he bench and the bar are both aware that cautionary instructions are effective only up to a certain point. There must be a line drawn in any trial where, after repeated exposure of a jury to prejudicial information ... cautionary instructions have little, if any, effect in eliminating the prejudicial harm.

818 A.2d at 423 (some citations omitted and emphasis supplied).

Appellant argues that the error at issue could not be remedied by any instruction as it presents the classic dilemma of unringing a bell after it has pealed. We are inclined to agree. And while we do not suggest that the need to seek curative instructions is eliminated when the bounds of closing argument are clearly crossed, we recognize that a cautionary instruction cannot remove the element of prejudice from a trial in all instances. *See Honaker*, 210 W.Va. at 61, 552 S.E.2d at 796 (recognizing that violation of *in limine* order may be "so inflammatory and prejudicial in its nature that it could not have been cured by an instruction to disregard"). We find this case to be just such an instance. It is doubtful that the trial court could have purged the necessarily prejudicial effects of Appellee's improper closing argument on the jury. As a result, we determine that the trial court abused its discretion in not granting Appellant a new trial in this matter based on the cumulative prejudicial effects on the jury that arose through the viewing of the cartoon, being subjected to disparaging remarks about plaintiff's counsel and expert witness, and from the wrongful appeal to the local passions and concerns of the jurors. Accordingly, the decision of the trial court is reversed and this matter is remanded for a new trial.

■ As a cross-assignment of error, Appellee raised the issue of the trial court's decision to limit the testimony of one of Appellant's treating physicians at trial. The radiologist who reviewed the pre-surgical x-ray of Ms. Toler—Dr. Roger Blake—was identified in Appellee's pre-trial memorandum as a fact witness. Before trial, Appellant moved to prevent Dr. Blake from testifying to anything outside what was included in his radiology report. Appellee argues that he is entitled to ask Dr. Blake, based on his review of the x-ray, questions related to the amount of space between the decedent's aorta and sternum. Taking the position that Dr. Blake should have been disclosed by Appellee as an expert witness, the trial court limited the testimony of Dr. Blake to the contents of the radiology report.

Appellee argues that Dr. Blake was not called to testify as an expert witness but merely as a fact witness. As this Court recognized in *State ex rel. Wiseman v. Henning*, 212 W.Va. 128, 569 S.E.2d 204 (2002), "[t]he testimony of a treating physician is qualitatively different from that of a physician hired solely to testify." *Id.* at 133 n. 2, 569 S.E.2d at 209 n. 2. Looking to cases decided under the federal counterpart to our discovery rule (Rule 26), Appellee argues that federal courts have ruled that all that is required in terms of disclosure with regard to a non-retained, non-specially employed treating physician is the physician's identity. *See Sullivan v. Glock, Inc.*, 175 F.R.D. 497, 500–01 (D.Md.1997); *but see Indemnity Ins. Co. v. American Eurocopter LLC*, 227 F.R.D. 421, 424 (M.D.N.C.2005) (discussing how testimony of treating physician "ventures into the area of expert testimony" when testimony includes physician's opinion and not just matters of treatment and diagnosis).

■ Rather than falling neatly into one category, a treating physician's testimony typically constitutes a hybrid of both fact and opinion. *See Sullivan*, 175 F.R.D. at 500. Although we acknowledged the difference between a treating physician's testimony and an expert witness' testimony in *Henning*, "we decline[d] to analyze the qualitative distinctions contained in a treating physician's expert opinion." 212 W.Va. at 134 n. 2, 569

S.E.2d at 209 n. 2. Given the circumscribed manner in which this issue arises, we find ourselves similarly constrained from addressing the distinction at length in this case. Because Dr. Blake was clearly identified as a witness that Appellee intended to call at trial, we do not believe that Appellee should be prohibited from asking this witness, within the permissible scope of the rules of evidence, questions that pertain to the issues being tried. *See* W.Va.R.Evid. 401, 402 (requiring evidence to be relevant and defining relevance). Given that the issue of adequate space between the decedent's sternum and aorta clearly relates to whether the standard of care was violated in this case, Dr. Blake should be permitted to testify as to his opinion on this matter. However, to prevent Appellant from making any claims predicated on surprise testimony or failure to disclose evidence, the trial court should permit Appellant the opportunity to take the deposition of Dr. Blake before the new trial commences. In this fashion, discovery is not precluded and neither is relevant evidence.

Based on the foregoing, the decision of the Circuit Court of Cabell County is reversed and this matter is remanded to permit a new trial to be held and for further proceedings consistent with the rulings of this opinion.

Reversed and remanded.

APPENDIX

## Dr. Setser Can't Win

- No Matter What Course He Takes, There Are Going to Be Potential Life Threatening Complications That Can Not Be Avoided
- If One of Those Complications Occur, He Is Going to be Criticized For Not Taking the Other Course
- Mr. Masters and his Expert, Dr. Herman, Will Take a Bad Result and Turn it Into Malpractice Every Time